## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**ALTICOR INC. and AMWAY CORP.,**          **CASE NO.:** 014-cv-542-ORL-37-DAB

      **Plaintiff,**

v.

**UMG RECORDINGS, INC., CAPITOL
RECORDS, LLC, SONY MUSIC
ENTERTAINMENT, and WARNER
MUSIC GROUP CORP.,**

      **Defendants.**

_____/

## COMPLAINT

Alticor Inc. ("Alticor") and Amway Corp. (collectively "Amway") bring this Complaint for breach of contract and for declaratory relief against UMG Recordings, Inc. and Capitol Records, LLC (collectively "UMG"), Sony Music Entertainment ("Sony"), and Warner Music Group Corp. ("Warner") (collectively "Record Companies" or "Defendants"). Amway alleges the following on personal knowledge or upon information and belief.

## NATURE OF THE ACTION

1.     This case is about the three largest Record Companies in the world conspiring to break promises they made to Amway, to ambush Amway, and to entrap people who uploaded videos with the Record Companies' copyrighted sound recordings on to YouTube (the "Accused Videos").

### Broken promises

2.     In 1998, UMG and Sony signed an agreement promising that they would provide Amway with notice of any allegations of copyright infringement by an Amway distributor, so that Amway would have a reasonable opportunity to investigate and halt any such alleged

infringements (the "Cooperation Agreement").  Warner subsequently became a party to the Cooperation Agreement.  Instead of complying with the Cooperation Agreement and providing Amway with reasonable notice of these alleged infringements, the Record Companies conspired to conceal this information for at least 18 months and to ambush Amway.

### The Ambush

3.     For over 14 years, the Record Companies never brought any alleged copyright infringement to the attention of Amway, even though several years ago they began searching for and identifying videos that some Amway distributors allegedly uploaded with infringing music to YouTube and other Internet sites.  UMG, Sony and Warner acted in concert to conceal this information for at least 18 months, and then jointly ambushed Amway with allegations of hundreds of alleged copyright infringements so that the Record Companies could try to make a mountain out of what would have been a molehill had they complied with the Cooperation Agreement.

### Entrapment

4.     Around 2007, the Record Companies entered into an agreement with YouTube that gave the Record Companies the ability to block or license every one of the Accused Videos uploaded to YouTube.  This licensing program is known as Content ID.  A video that provides an animated description of Content ID can be found on YouTube's web site at the following URL: http://www.youtube.com/t/contentid.  In short, Content ID works in the following way:

a.     First, the Record Companies provide digital files of their copyrighted sound recordings to YouTube.

b.     Second, YouTube stores these files (which it calls reference files) in its computers.

c.    Third, when someone uploads a new video, YouTube automatically compares it to every reference file in its computers.  If the video matches, in whole or in part, to a reference file with one of the Record Companies' sound recordings, YouTube provides the Record Companies with three choices:  (1) they can block the video, in which case it never appears on YouTube, (2) they can permit the video to appear on YouTube and track its usage, or (3) they can permit the video to appear on YouTube and receive a portion of any advertising and other revenue streams generated by the video.

d.    Fourth, YouTube notifies the person who uploaded the video that the video contains copyrighted material owned by one of the Record Companies, and that the Record Company may block the video or permit it to remain on YouTube and generate advertising revenue from the video.

5.    Over 85% of the Accused Videos were uploaded to YouTube.  The Record Companies made a conscious decision not to block these videos, but instead to permit them to appear on YouTube so the Record Companies could receive advertising and sales revenue generated by the videos.  The Record Companies have entrapped those YouTube users who uploaded the videos by communicating permission to post their videos and to leave them on YouTube, and later accusing the same uploaders of the videos – and Amway – of copyright infringement.  After profiting from these alleged infringing videos for years, the Record Companies now seek a double recovery.

6.    The Record Companies failed in another way to reasonably stop all of the alleged infringements, whether they appeared on YouTube or other Internet websites.  As copyright

3

holders, they quickly and easily could have removed the Accused Videos from the Internet by sending a simple "DMCA" notice under the Digital Millennium Copyright Act (17 U.S.C. § 512(c)).  Instead, the Record Companies acted in concert to consciously decide not to send DMCA removal notices, and instead, allow the Accused Videos to remain on the Internet.

7.      In this   case, Amway also challenges the Record Companies' infringement allegations on additional grounds, including:

a)      By granting permission for the Accused Videos to be posted and remain on YouTube, the Record Companies granted a license for those videos that precludes them from infringing the Record Companies' copyrights;

b)      The majority of the Accused Videos were created and uploaded to the Internet outside the United States, intended for viewing outside the United States, and do not give rise to a claim for copyright infringement under the copyright laws of the United States;

c)      The Accused Videos in certain cases constitute fair use, and therefore cannot form the basis for any claims of copyright infringement;

d)      Defendants are committing copyright misuse by charging infringement of copyrights for which, in many cases, they have received compensation, and therefore are precluded from enforcing those copyrights against Amway;

e)      Defendants' claims of copyright infringement are barred under the doctrine of laches, estoppel, and unclean hands; and,

f)      Amway is not directly, vicariously, or contributorily liable for Accused Videos that were not created by or for Amway, not authorized by Amway, and for which Amway received no direct financial benefit.

**THE PARTIES**

8.     Alticor Inc. is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business at 7575 Fulton Street East, Ada, Michigan, 49355. Alticor Inc. is the successor in interest to Amway Corporation (Michigan), a party to the Cooperation Agreement.

9.     Amway Corp. is a corporation organized and existing under the laws of the State of Virginia, with its principal place of business at 7575 Fulton Street East, Ada, Michigan, 49355. Amway Corp. is an indirect subsidiary of Alticor Inc.

10.     Upon information and belief, UMG Recordings, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California.

11.     Upon information and belief, Capitol Records, LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York, and is a subsidiary of UMG Recordings, Inc.

12.     Upon information and belief, Sony Music Entertainment is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

13.     Upon information and belief, Warner Music Group Corp. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction pursuant to 17 U.S.C. § 101 *et seq.*; 28 U.S.C. § 1331; 28 U.S.C. § 1332; 28 U.S.C. §1338(a); and, 28 U.S.C. §§ 2201 and 2202.  This Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

15.    Complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.00.

16.    Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) in that Amway is doing business in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendants are subject to jurisdiction in this District.

## BACKGROUND ABOUT AMWAY

17.    Since 1959, Amway has provided an opportunity for millions of individuals to own their own businesses as independent distributors (known as Independent Business Owners, or IBOs) of Amway brand products.

18.    In the United States market, Amway Corp. offers Amway brand products to IBOs for sale.  In markets outside of the United States, there are a number of distinct legal entities that offer Amway brand products to IBOs for sale.  Each distinct legal entity is formed under the laws of the jurisdiction wherein the market is located.  These entities, as well as Amway Corp., are referred to as "Affiliates" of Alticor.  They are also indirect subsidiaries of Alticor.

19.    Amway has over 450 unique products bearing its own trademarks that it offers through a network of independent distributors for sale.  Some of Amway's well-known brands include Nutrilite® (nutritional supplements), Artistry® (cosmetics and beauty products), and L.O.C.® (home cleaning products).  More than 900 scientists, engineers, and technicians in 75 research and development and quality assurance labs around the world are employed to develop and improve the Amway products.  These investments in innovation are protected with more than 1,000 patents and over 700 pending patent applications.

20.    The Amway brand products are distributed through individual IBOs. IBOs are not employees.  Rather, each IBO has an annually renewable contract with the Affiliate responsible for the country where the distributor is located.  For example, in the United States, each IBO has

a contract with Amway Corp. IBOs have broad independence, highlighted by the freedom to set their own hours, select which products to sell, and set the prices at which to offer products.

21.     IBOs earn income through the retail markup on the sale of Amway products, and also through a performance bonus system that rewards the sale of products by IBOs themselves and by "downline" IBOs, i.e., those IBOs sponsored into the Amway business below them. IBOs do not earn income by sponsoring others into the Amway business; rather, all income is tied to the sale of products.

22.     As part of an IBO's contract, the IBO agrees to abide by Rules of Conduct. These Rules do not require IBOs to use videos to promote Amway products or the Amway business opportunity. Instead, IBOs act autonomously in determining the manner in which their promotional activities are carried out. The Rules do prohibit copyright infringement of others' works, and once a violation of a Rule is discovered, steps are taken to enforce the contract against unauthorized IBO activities.

## THE COOPERATION AGREEMENT

23.     In 1996, UMG, Sony, and several other record companies sued over 50 high-level IBOs and their related businesses for direct copyright infringement in a case captioned *Arista Records, Inc. et al. v. Amway Corporation et al.*, No. 96-cv-175 (M.D. Fla. 1996). The high-level IBOs and their related businesses hired a professional videographer to create commercial quality VHS videotapes. The videographer included copyrighted songs on the VHS tapes without obtaining permission from the copyright owner. The high-level IBOs and their related companies sold large quantities of these professionally made VHS tapes for substantial profit. Amway did not make or sell any such videotapes, and was not charged with direct copyright infringement. Rather, it was sued for vicarious liability based on the alleged direct liability of the IBOs and their related businesses.

7

24.     Amway vigorously challenged the allegation of vicarious liability for lacking merit.   The sale of these alleged infringing VHS tapes began and grew without Amway's knowledge. Amway did not condone the making and sale of such videotapes, did not receive any money from the sale of such videotapes, and upon learning of these activities promptly took measures to stop such practices by IBOs and their related companies.

25.     The prior litigation concluded with the execution of a settlement agreement that included an agreement on future cooperation between the Record Companies and Amway.  The Cooperation Agreement includes the following pertinent provisions:

- Future Cooperation (Paragraph 13.1):  The parties agreed to "cooperate to ensure that no independent distributor of Amway products . . . will, in the future, infringe any copyrights or other rights in sound recordings owned or controlled by RIAA member companies." [The Recording Industry Association of America (RIAA) is a trade association. UMG, Sony and Warner are each members of the RIAA.]

- Reasonable Notice of New Allegations (Paragraph 13.2):   If the Record Companies "reasonably believe" that an Amway distributor is engaging in copyright infringement, they are required to "notify in writing both Amway and (to the extent known) the independent distributor . . . ."   Furthermore, "at a minimum all facts known to the Plaintiff Record Companies shall be provided to Amway . . . concerning the alleged infringement."   Amway agreed to provide the identity and address of the distributor involved in the accused activity and as ascertained by Amway.

- Amway Report (Paragraph 13.3):   Paragraph 13.3 allows Amway 30 days to investigate the allegation and to provide "a report in writing regarding the charge

8

of infringement." Paragraph 13.3 does not specify what information must be contained in the report. Read together, paragraphs 13.2 and 13.3 call for a report that contains the names and addresses of the distributor allegedly involved and ascertained by Amway.

- Option to join the Cooperation Agreement (Paragraph 13.8): Paragraph 13.8 provides that the "RIAA shall use its best efforts to encourage its member record companies which are not parties to this Agreement to abide by the [Cooperation Agreement set forth in Paragraphs 13.1 to 13.8]."

26.     UMG, Sony and Amway are signatories to the Cooperation Agreement. As explained further below, Warner subsequently became a party to the Cooperation Agreement through its conduct and express admission.

## THE PRESENT DISPUTE

27.     On November 27, 2012, more than 14 years after the Cooperation Agreement was signed, the Record Companies sent Amway a letter identifying hundreds of links to Internet videos posted throughout the world which allegedly included unauthorized use of the Record Companies' copyrighted music. Most of these Accused Videos had been available on the Internet for years, with some uploaded as early as 2006. The Record Companies asserted that the November 27 letter constituted notice pursuant to Paragraph 13.2 of the Cooperation Agreement, and demanded a comprehensive and detailed report – beyond what is required by Paragraphs 13.2 and 13.3 – within thirty days. Warner, although not a signatory to the Cooperation Agreement, expressly agreed to abide by the procedures of the Cooperation Agreement, as expressly contemplated pursuant to Paragraph 13.8 of the Cooperation Agreement.

28.     Amway immediately launched an extensive investigation of the Record Companies' allegations. The investigation consumed hundreds of hours. On January 25, 2013,

9

pursuant to a thirty-day extension granted by the Record Companies, Amway responded to the November 27 letter and provided a 41-page report consistent with the requirements of Paragraphs 13.2 and 13.3 of the Cooperation Agreement.  That report included the names and addresses of IBOs who Amway believed at that time either fixed music to or uploaded one of the Accused Videos.  Amway also explained that its investigation showed that the majority of the Accused Videos were uploaded outside of the United States; most of the Accused Videos appeared to be created and/or uploaded by IBOs; certain of the Accused Videos appeared to be in the nature of personal photographs and video clips set to music; and none of the Accused Videos appeared to have been offered for sale.

29.    In 2013, the Record Companies sent additional letters identifying more Accused Videos.  Amway promptly investigated these allegations and learned that most of the newly identified videos had been uploaded to the Internet prior to the Record Companies' November 2012 letter.  Apparently, the Record Companies had only recently found these older videos, or they continued to stockpile them for another ambush on Amway.  In letters dated June 13, June 28, November 1, 2013 and March 26, 2014, Amway provided further responses to the Record Companies' belated and additional allegations, including the names and addresses of IBOs that Amway believed at that time either fixed music to or uploaded one of the Accused Videos.

30.    While the Record Companies' letters after November 2012 identified additional uploaded videos, the number of videos identified in those letters that were uploaded to the Internet after November 2012 has declined.

31.    Pursuant to the Cooperation Agreement, Amway and the Record Companies started to proceed through the mediation process required by Paragraphs 13.4 to 13.7.  Paragraph 13.6 requires three days of mediation.

10

32.     On December 2-3, 2013, Amway, the Record Companies and some IBOs and their representatives participated in a confidential mediation process administered by JAMS and conducted by the Honorable Daniel Weinstein (Ret.).  The parties agreed to schedule the third day of mediation, on a mutually convenient date, after the Record Companies provide additional information to the IBOs and Amway.  The mediator and the parties subsequently selected April 3 as the third day for the mediation.

33.     On April 3, 2014, Amway and the Record Companies continued the mediation process administered by JAMS and conducted by Judge Weinstein.  Amway and the Defendants failed to resolve the present dispute through mediation.

34.     The Record Companies' assertions that Amway is directly, vicariously, or contributorily infringing their copyrights adversely affects Amway and its business, and unless prevented by this Court, will continue to harm and adversely affect it.  The Record Companies' allegations place a cloud over Amway's business operations and its IBOs that sell Amway brand products, thereby damaging them.  Accordingly, to resolve the legal and factual questions raised by the Record Companies and to afford relief from the uncertainty and controversy that their unwarranted assertions have caused, Amway is entitled to a declaratory judgment of its rights under 28 U.S.C § 2201.

## THE ACCUSED VIDEOS

35.     The Accused Videos differ in several significant ways from the VHS videotapes at issue in the 1996 litigation.  For example, most of the Accused Videos were posted to the Internet in the same manner that hundreds of millions of persons around the world do so on a daily basis with their homemade videos.  The Accused Videos were not offered for sale; were viewable at no charge; and, in most cases, were created and uploaded outside the United States.  Ninety-nine

percent of the persons allegedly involved in creating or uploading the Accused Videos had nothing to do with the previous lawsuit, and most were not even part of Amway in the 1990s.

36.     Approximately 75 % of the Accused Videos appear to have been created and uploaded outside of the United States.  In many of them, the text and speech is in a foreign language.  These videos do not appear to be intended for viewing in the United States, or to have any impact in the United States.  There is no evidence that these videos were viewed in the United States by anyone other than the Record Companies or Amway as part of their investigation of the Accused Videos.

37.     Only six of the Accused Videos were made by or for Amway Corp.  The Record Companies accused Amway of vicarious and contributory liability for the remaining Accused Videos, even though Amway did not create, authorize or benefit from them.  Despite extensive investigations, Amway has not discovered the identity of the person who created or uploaded many Accused Videos because the identity of the actual creators and uploaders is not readily ascertainable.  It is not uncommon for persons to upload videos to the Internet using pseudonyms.

## YOUTUBE

38.     Approximately 85 % of the Accused Videos were uploaded to YouTube.

39.     YouTube provides a content distribution platform that makes it easy for anyone to discover, watch, and upload videos.  YouTube reportedly attracts more than one billion unique users each month, accounting for more than six billion hours of video watched each month.  Over 100 hours of video are uploaded to YouTube every minute.  YouTube is localized in 56 countries, and operates in 61 languages. Seventy percent of all YouTube traffic comes from countries outside the United States.

0083122\161416\1567908v2

40.     Since early 2007, YouTube has operated a state-of-the-art copyright identification and filtering system, through which copyright holders can identify user-uploaded videos that contain some portion of their copyrighted works, and choose, in advance, what they want to happen to those videos when found. This system, called Content ID, works in the following manner.

41.     Copyright holders participating in Content ID deliver copies of copyrighted content they own (e.g., digital files of sound recordings) to YouTube.  YouTube loads these "reference files" into its computers.  When a user uploads a new video, YouTube automatically compares that new video's content to all of the reference files stored in YouTube's computers to determine if the uploaded video includes any portion of a reference file.

42.     YouTube allows copyright holders to choose in advance one of three policies that will be enforced when Content ID matches a video to the copyright holders' content in a reference file.  The copyright holder may choose to (1) block the video from being uploaded, (2) allow the video to remain on YouTube and receive usage data on the video, or (3) monetize the video by receiving a share of advertising generated by views of the video on YouTube, and also through "buy-links" that permit viewers to purchase authorized versions of songs appearing on uploaded videos from sources such as iTunes.  Once Content ID matches a video to a reference file, YouTube automatically applies the policy the copyright holder sets for that reference file.

43.     The Record Companies have embraced the "monetize" option in Content ID for millions of videos on YouTube that contain their sound recordings, including the most popular ones.  As a result, the Record Companies have received many millions of dollars from the videos they have chosen to monetize on Content ID.  These revenues come from at least two sources: advertising and buy-links.

13

44. *Advertising:* YouTube sells advertising that appears when a video is viewed on YouTube. More than a million advertisers are using Google ad platforms in conjunction with YouTube videos. When a Record Company chooses to monetize a video identified by Content ID, it receives a share of the advertising revenue attributable to the video. One or more of a variety of advertisements may appear on the video's webpage. One type is a "pre-roll ad," which is a video advertisement that appears before the video begins to play. Another type is "an overlay ad," which appears over a portion of the video, usually in the form of a banner advertisement, while the video continues to play. A third type is a "companion ad," which appears as a traditional ad usually along the side of the video.

45. *Buy-links:* If Content ID matches a video to one of the Record Companies' reference files that has been earmarked for monetization, YouTube places a buy-link just under the video on the webpage where the video appears. If a person viewing the video likes the music on the video and wishes to purchase a digital download of the sound recording, the viewer can click on the buy-link to go to the Google Play, AmazonMP3, or iTunes stores, where the viewer can purchase the sound recording. The Record Companies receive a portion of the revenue from such sales and thereby profit from increased sales of digital sound recordings to viewers of YouTube videos who utilize the buy-links.

46. The Record Companies elected to track or monetize the hundreds of Accused Videos on YouTube. (If the Record Companies had elected to block those videos, no one ever would have seen them on YouTube.) Below is a screen shot of the webpage of one of the Accused Videos, showing the advertisements and buy-link that allowed the Record Companies to profit from the videos:

14

¡Las Grandes Aventuras de Cris y Luis! The DUBAI Edition - YouTube

Page 1 of 2



47.     As part of the Content ID program, YouTube sends each participating copyright holder a monthly report that provides detailed information about the videos with content that matches the copyright holder's reference files. These reports identify specific information about the videos (e.g., URL, Title, Video ID, *etc.*), including which videos were blocked, which videos were marked for monitoring, which videos were monetized, and the number of times each video was viewed. At any time, a copyright holder may choose to block a video that contains a portion of the copyright holder's content.

48.     The reference files that the Record Companies provide to YouTube as part of the Content ID program, and the matching and reporting functions available to the Record Companies through Content ID, are not available to Amway. As a result, it is much more

15

difficult for Amway than it is for the Record Companies to identify YouTube videos that allegedly include works as to which the Record Companies claim copyright.

49.    *Permission to upload videos:*    YouTube notifies uploaders whose videos are identified as including content matching a reference file, and that the video may contain copyrighted material.    But these notices do not request the uploader to cease use of the copyrighted material or warn the uploader that he or she may be sued for copyright infringement. Instead, the uploader learns that the video may be blocked or that it may be used as a host for advertising.  If the video then appears on YouTube, it is obvious that the copyright holder did not choose to block the video.  The uploader also may find advertisements and buy links associated with the video appearing on YouTube. The combination of these actions, sanctioned by the Record Companies, lead the uploader to believe that he or she has received permission to post and leave the video on YouTube.

## COUNT I

### BREACH OF CONTRACT AND
### IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

50.    Amway repeats and realleges each and every allegation set forth in Paragraphs 1 through 49 hereof.

51.    Amway, UMG and Sony are signatories to the Cooperation Agreement.

52.    The Cooperation Agreement included an offer for other member record companies of the RIAA to abide by the terms of the Cooperation Agreement.

53.    In the Record Companies' letter dated November 27, 2012, Warner expressly confirmed its acceptance of the offer to abide by the terms of the Cooperation Agreement, and by doing so, became a party to the Cooperation Agreement.  Warner also engaged in conduct both

before and after November 27, 2012 that manifested its acceptance of the offer to become a party to the Cooperation Agreement.

54.     A duty of good faith and fair dealing is implied in every contract.

55.     The Record Companies  breached the Cooperation Agreement, and the duty of good faith and fair dealing, by:

a.      Failing to provide Amway with prompt, reasonable notice that the Defendants reasonably believed that Amway distributors were engaging in activities that may infringe the copyrights in their sound recordings and instead, ambushing Amway after secretly stockpiling hundreds of alleged infringements for at least 18 months;

b.      Failing to take reasonable measures to prevent and mitigate the alleged copyright infringements by electing to "block" the Accused Videos on YouTube through Content ID, or by sending simple DMCA take-down notices to the Internet service providers hosting the Accused Videos;

c.      Failing to notify Amway in writing of  "all facts known" to the Record Companies concerning the alleged infringement, including the fact that the Record Companies had been generating revenue from most of the Accused Videos through Content ID; and

d.      Attempting to entrap the uploaders of the Accused Videos by leading them to believe they had permission to post their videos to YouTube, and now seeking a double recovery on those videos for which the Record Companies already have been compensated.

56.    As a result of Defendants' breach of the Cooperation Agreement, Amway has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT II

## TORTIOUS INTERFERENCE WITH CONTRACTAL RIGHTS

57.    Amway repeats and realleges each and every allegation set forth in Paragraphs 1 through 49, and 51 through 56 hereof.

58.    The Cooperation Agreement is a valid and enforceable contract.

59.    Warner, Sony, and UMG were aware of all of the terms of the Cooperation Agreement that Amway had with each of the Record Companies.

60.    Warner and Sony, acting in concert, utilizing improper means and for an improper purpose, intentionally interfered with Amway's rights in the Cooperation Agreement with UMG. There was no legal justification for Warner and Sony's interference.  UMG has in fact breached the Cooperation Agreement and associated duty of good faith and fair dealing.

61.    Warner and UMG, acting in concert, utilizing improper means and for an improper purpose, intentionally interfered with Amway's rights in the Cooperation Agreement with Sony. There was no legal justification for Warner and UMG's interference.  Sony has in fact breached the Cooperation Agreement and associated duty of good faith and fair dealing.

62.    Sony and UMG, acting in concert, utilizing improper means and for an improper purpose, intentionally interfered with Amway's rights in the Cooperation Agreement with Warner. There was no legal justification for UMG and Sony's interference.  Warner has in fact breached the Cooperation Agreement and associated duty of good faith and fair dealing.

63.    As a result of Defendants' wrongful interference, Amway has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT III

## CIVIL CONSPIRACY

64.     Amway repeats and realleges each and every allegation set forth in paragraphs 1 through 49, 51 through 56 and 58 through 63 hereof.

65.     The Record Companies jointly agreed upon and pursued a strategy of secretly stockpiling the Accused Videos, ambushing Amway, and concealing its license to uploaders of YouTube videos to tortiously interfere with the Cooperation Agreement that Amway has with each of the Record Companies, and  for the improper purpose of trying to extort a large sum of money from Amway.

66.     As a result of the Record Companies' conspiracy, Amway has suffered and continues to suffer damages in an amount to be determined at trial.

## COUNT IV

## DECLARATORY JUDGMENT

67.     Amway repeats and realleges each and every allegation set forth in Paragraphs 1 through 49, 51 through 56, 58 through 63 and 65-66 hereof.

68.     Amway seeks a declaration that Amway is not directly, vicariously, or contributorily liable for alleged acts of copyright infringement relating to the Accused Videos for the reasons set forth below.

## NO DIRECT INFRINGEMENT

69.     Amway seeks a declaration that Alticor Inc. and Amway Corp. have not committed any act of direct copyright infringement with respect to any Accused Videos created by or for Alticor Inc. or Amway Corp.

0083122\161416\1567908v2

70.     Amway seeks a declaration that Alticor Inc. and Amway Corp. have not committed any act of direct copyright infringement with respect to the Accused Videos created and uploaded by United States IBOs.

71.     Amway seeks a declaration that Alticor Inc. and Amway Corp. have not committed any act of direct copyright infringement with respect to the Accused Videos created and uploaded by IBOs and Affiliates in foreign markets.

## NO VICARIOUS LIABILITY

72.     In order to establish vicarious liability, the Record Companies must prove that Amway Corp. and Alticor (1) had the right and ability to control *the infringing activity*, and (2) received a *direct* financial benefit from the alleged infringing activity.

73.     Amway Corp. does not have the right and ability to control alleged infringing activities committed by United States IBOs. Amway Corp. can enforce its contract if and when United States IBOs do not comply with it (e.g., posting unauthorized videos with unlicensed music), but Amway Corp. cannot control the Internet. Amway Corp. is not the gatekeeper to the Internet websites where the Accused Videos were posted, and could not prevent United States IBOs from posting the Accused Videos, or any other content on those websites.

74.     Amway Corp. does not have the right and ability to control alleged infringing activities committed by foreign Affiliates or foreign IBOs. Amway Corp. is not in privity of contract with foreign Affiliates or foreign IBOs. Amway Corp. is not the gatekeeper to the Internet websites where the Accused Videos were posted, and could not prevent foreign IBOs or foreign Affiliates from posting the Accused Videos, or any other content on those websites.

75.     Likewise, Alticor does not have the right and ability to control alleged infringing activities committed by IBOs or Affiliates, whether in the United States or in foreign markets. Alticor is not in privity of contract with IBOs, whether in the United States or in foreign markets.

Alticor is not the gatekeeper to the Internet websites where the Accused Videos were posted, and could not prevent IBOs or Affiliates, whether in the United States or in foreign markets, from posting the Accused Videos, or any other content on those websites.

76.     Alticor and Amway Corp. received no direct financial benefit from the Accused Videos.  There is no proof that the Accused Videos were offered for sale.  Neither Alticor nor Amway Corp. received any revenue or other financial benefit from the Accused Videos.  Amway Corp.'s rules and procedures consistently instruct IBOs to only use licensed music, if they choose to use any music at all.  Over 99.9% of all IBOs comply with this rule.  Less than 0.1% of IBOs uploaded an Accused Video, and most of the videos received only a negligible number of views.

77.     Alticor seeks a declaration that it is not vicariously liable for alleged acts of copyright infringement relating to the Accused Videos created and uploaded by Amway Corp., United States IBOs, or IBOs and Affiliates in foreign markets.

78.     Amway Corp. seeks a declaration that it is not vicariously liable for alleged acts of copyright infringement relating to the Accused Videos created and uploaded by United States IBOs or IBOs and Affiliates in foreign markets.

## NO CONTRIBUTORY LIABILITY

79.     Neither Alticor nor Amway Corp. induced, caused, or materially contributed to the creation of the Accused Videos or their posting to the Internet.

80.     Amway Corp. offers copyright-focused education to United States IBOs, which is intended to educate them about copyright issues and provide them with guidance on how to lawfully use copyrighted materials in connection with their independent Amway businesses.  In cooperation with the Independent Business Owners Association International, Inc. ("IBOAI), an advocacy organization for IBOs, Amway Corp. and the IBOAI have provided United States IBOs with a "Music Copyrights Guide," first created in 2000 and updated in 2004, 2010, and 2013.

21

The efficacy of Amway Corp.'s copyright education efforts can be seen from the absence in the present dispute of most of the IBO defendants from the 1996 lawsuit, and the miniscule proportion of the IBO population that has been implicated in the present dispute.

81.     Amway Corp. seeks a declaration that it is not contributorily liable for alleged acts of copyright infringement relating to the Accused Videos created or uploaded to the Internet by United States IBOs, Affiliates or foreign IBOs.

82.     Alticor seeks a declaration that it is not contributorily liable for alleged acts of copyright infringement relating to the Accused Videos created or uploaded to the Internet by Amway Corp., United States IBOs, or IBOs and Affiliates in foreign markets.

## IMPLIED LICENSE

83.     The Record Companies have granted an implied license for the Accused Videos through the YouTube Content ID system because the Record Companies elected not to block the Accused Videos, and instead chose to track and/or receive revenue from the Accused Videos. The uploaders of these Accused Videos received notices that communicated the Record Companies' permission to post the videos on YouTube.

84.     Amway seeks a declaration that Accused Videos uploaded to YouTube are impliedly licensed, and therefore cannot form the basis for any claim of copyright infringement.

## FAIR USE

85.     Certain of these Accused Videos are in the nature of personal photographs and home videos of days in the lives of people who happen to be IBOs.

86.     These Accused Videos are not musical compositions, and the sound recordings on the videos do not promote the videos themselves or any products referenced in them.

87.     These Accused Videos are new creative works whose purpose is not to feature the Record Companies' sound recordings.

88.     These transformative, non-commercial uses of the Record Companies' copyrighted sound recordings have no adverse effect on the market for, or value of, the recordings.

89.     The videos do not act as a substitute for a legal sale of the Record Companies' sound recordings (i.e. through a digital download or streaming service), especially considering the sound recordings merely appear as background music in the videos and in some cases are not complete and/or are low quality copies.

90.     Amway seeks a declaration that such Accused Videos constitute fair use, and therefore cannot form the basis for any claims of copyright infringement.

## NO EXTRATERRITORIAL APPLICATION OF COPYRIGHT LAW

91.     Approximately 75 % of the Accused Videos were created and uploaded to a website outside of the United States.  Many of these videos contain foreign language speech and text.  They were never intended for viewing in the United States.

92.     There is no proof that anyone affiliated with Amway transmitted the foreign-origin Accused Videos into the United States, or committed any unauthorized copying of these videos in the United States.

93.     The correct forum for pursuing the Record Companies' claims as to these Accused Videos is in the country where the alleged acts of infringement occurred.

94.     Amway seeks a declaration that Accused Videos created and uploaded to the Internet outside the United States do not constitute infringement under the copyright laws of the United States.

## COPYRIGHT MISUSE

95.     The Record Companies infringement claims against Alticor, Amway Corp. and IBOs for Accused Videos on YouTube are an attempt to get paid a second time. The Record

Companies elected to use Content ID to derive revenue from Accused Videos that were uploaded to YouTube, rather than electing to block the Accused Videos from appearing on YouTube. The Record Companies also elected not to avail themselves of the DMCA to have Internet service providers remove the Accused Videos from their websites. Notwithstanding that all the while Defendants have permitted, encouraged, licensed and profited from the use of the Accused Videos by these actions, Defendants audaciously allege copyright infringement and seek damages for these Accused Videos.

96.     Amway seeks a declaration that Defendants are committing copyright misuse as to Accused Videos uploaded to YouTube, and therefore are precluded from enforcing those copyrights against Amway.

## LACHES

97.     Defendants' unreasonable and inexcusable delay in providing notice to Amway and in alleging copyright infringement has unfairly prejudiced Amway.

98.     Amway seeks a declaration that Defendants' claims of copyright infringement are barred under the doctrine of laches.

## ESTOPPEL

99.     Defendants had knowledge of the Accused Videos on YouTube by way of the YouTube Content ID system but elected not to block these Accused Videos, and instead chose to track and/or receive revenue from these videos through Content ID. Defendants had knowledge that notices were sent to the uploaders of these Accused Videos that communicated Defendants' permission to post the videos on YouTube. Defendants intended these uploaders to rely on these notices and thus not remove the Accused Videos from YouTube.

100.     After receiving notices from Defendants, uploaders of Accused Videos to YouTube necessarily believed that Defendants would not assert copyright infringement claims

24

for these videos, and did not know that Defendants would do so.  These uploaders relied on Defendants' conduct, and were injured as a result.

101.    Amway seeks a declaration that Defendants' claims of copyright infringement are barred under the doctrine of estoppel.

## UNCLEAN HANDS

102.    Defendants' secret stockpiling of the Accused Videos for at least 18 months, and subsequent ambush of Amway, as well as Defendants' election to track and/or receive revenue from these videos through Content ID rather to block the Accused Videos on YouTube through Content ID, or by sending DMCA take-down notices to the Internet service providers hosting the Accused Videos, constitutes inequitable conduct directly related to Defendant's copyright infringement claims.

103.    Amway seeks a declaration that Defendants' claims of copyright infringement are barred under the doctrine of unclean hands.

**WHEREFORE,** Amway asks this Court to:

a)    enter judgment against each of the Defendants for breach of the Cooperation Agreement;

b)    enter judgment against each of the Defendants for tortious interference with contractual rights;

c)    enter judgment against Defendants for conspiring to tortiously interfere with Amway's rights in the Cooperation Agreement;

d)    declare that Alticor Inc. and Amway Corp. are not directly, vicariously or contributorily liable for alleged acts of copyright infringement relating to the Accused Videos;

e)    declare that Accused Videos uploaded to YouTube are impliedly licensed, and therefore cannot form the basis for any claim of copyright infringement;

f)    declare that certain Accused Videos constitute fair use, and therefore cannot form the basis for any claim of copyright infringement;

g)    declare that certain Accused Videos created and uploaded to the Internet outside the United States do not give rise to a claim for infringement under the copyright laws of the United States;

h)    declare that Defendants are committing copyright misuse as to Accused Videos uploaded to YouTube, and therefore are precluded from enforcing those copyrights against Amway;

i)    declare that Defendants' claims of copyright infringement are barred under the doctrine of laches;

j)    declare that Defendants' claims of copyright infringement are barred under the doctrine of estoppel;

k)    declare that Defendants' claims of copyright infringement are barred under the doctrine of unclean hands;

l)    award Amway the reasonable attorney's fees and costs incurred relative to this action; and,

m)    award such other and further relief as this Court deems appropriate.

Dated: April 3, 2014                       Respectfully Submitted,

/s/ JAMES S. TOSCANO
**JAMES S. TOSCANO**
Florida Bar No. 899909
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 North Eola Drive
Post Office Box 2809
Orlando, Florida 32802-2809
Telephone:  (407) 843-4600
Facsimile:   (407) 843-4444

James R. Sobieraj
David S. Fleming
William H. Frankel
Jacob C. Bachman
Joshua S. Frick
BRINKS, GILSON & LIONE
455 N. Cityfront Plaza Dr., Suite 3600
Chicago, IL 60611
Telephone:  (312) 321-4200
Attorneys for Plaintiffs
TO BE ADMITTED PRO HAC VICE